IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

NANCY DUBE,
      Plaintiff,

vs.                              Case No. 3:09cv99/LAC/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D), and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.      PROCEDURAL HISTORY

Plaintiff's application for DIB, filed July 1, 2004, was denied initially and on reconsideration (Tr. 58–59, 60–62, 64–66, 88).[1]  On August 23, 2007, following a hearing, an administrative law judge ("ALJ") rendered a decision in which he found that Plaintiff was not under a "disability" as

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on May 27, 2009 (Doc. 9).

defined in the Act (Tr. 20–37). On January 9, 2010, the Appeals Council of the Social Security Administration ("SSA") denied Plaintiff's request for review (Tr. 6–8). Thus, the decision of the ALJ stands as the final decision of the Commissioner, now subject to review in this court. <u>Ingram v. Comm'r. of Soc. Sec. Admin.</u>, 496 F.3d 1253, 1262 (11th Cir. 2007); <u>Falge v. Apfel</u>, 150 F.3d 1320 (11th Cir. 1998). This appeal followed.

II.     FINDINGS OF THE ALJ

On August 23, 2007, the ALJ made several findings relative to the issues raised in this appeal (Tr. 20–37):

1)     Plaintiff meets the insured status requirements of the Act at least through August 23, 2007, the date of the ALJ's decision.

2)     Plaintiff has not engaged in substantial gainful activity since October 27, 2004, the (amended) date she alleges she became disabled.[2]

3)     Plaintiff has the following severe combination of impairments: degenerative joint disease, cervical spine disease, and right-wrist injury.

4)     Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5)     Plaintiff has the residual functional capacity ("RFC") to perform the full range of light work, and she experiences no significant mental limitations.

6)     Plaintiff can perform her past relevant work as an apartment manager, retail store manager, hair salon manager, cashier, and assembly-line worker. This work does not require the performance of work-related activities precluded by Plaintiff's RFC.

7)     Plaintiff has not been under a disability, as defined in the Act, from October 27, 2004, through August 23, 2007, the date of the ALJ's decision.

III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper

---

[2] Thus, the time frame relevant to this appeal is October 27, 2004 (amended alleged onset date (*see* Tr. 86)) to August 23, 2007.

legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY[3]

A.      Personal History

Plaintiff was born on October 27, 1954 (*see* Tr. 87), and turned fifty years of age on October 27, 2004, the date she alleges she became disabled.  Plaintiff has a twelfth-grade education and varied past work experience, including the past relevant work identified by the ALJ.

B.      Relevant Medical History

Plaintiff underwent a bilateral subcutaneous mastectomy for fibrocystic disease, followed by reconstructive surgery with silicone implants in 1987.  Plaintiff later experienced severe breast encapsulation, which had not responded to open capsulotomy.  In 1994 Luis R. Espinoza, M.D.,

---

[3] Unless otherwise noted, the information in this section is derived from the opinion of ALJ.

Case No. 3:09cv99/LAC/EMT

opined that Plaintiff had silicone breast-implant related atypical connective tissue disease. Laboratory studies revealed negative antinuclear antibody ("ANA") rheumatoid factor, centromere antibody, and skin-sensitizing antibody.  Plaintiff's implants were removed and replaced (Tr. 162).

After Plaintiff complained of muscle strain in April 1999, an x-ray of her left shoulder was obtained and revealed minimal degenerative changes at the acromioclavicular ("AC") joint, but no acute fractures or regions of bony destruction were observed (Tr. 192).  Likewise, a cervical spine series revealed only mild degenerative changes (Tr. 191).  In June 2003 Plaintiff complained of a left ankle injury and resultant pain, but four x-ray views of the ankle were "unremarkable," and the ankle was described as "normal" (Tr. 189).

On May 25, 2004, Plaintiff presented to George D. Watts, M.D., who practices in the areas of sports medicine and orthopaedic surgery, for evaluation of her right wrist.  Plaintiff reported that she injured her right wrist sixteen days earlier when she fell (Tr. 212).  Dr. Watts noted obvious swelling about the radial aspect of the wrist, tenderness in the "snuffbox" area, and slight tenderness over the distal radius, but neurovascular status was normal (*id.*).  Plaintiff was placed in a thumb spica cast and x-rays were ordered, which revealed a navicular fracture.  Plaintiff reported that the thumb spica was making her pain worse, and although the spica was Dr. Watts' preferred treatment choice, he agreed to apply a wrist-hand orthosis instead (Tr. 211).  On June 8, 2004, Plaintiff returned for follow-up and reported some pain in her wrist.  Repeat x-rays revealed some early periosteal new bone formation about her distal radius, indicating a healing, non-displaced fracture (Tr. 210).  Plaintiff was advised to continue with the orthosis for one month, discontinue its use thereafter, and check back only if she had pain (*id.*).  Plaintiff returned to Dr. Watts on August 4, 2004, reporting wrist pain and numbness in her thumb, index, and long fingers (Tr. 209).  Dr. Watts noted that Plaintiff previously improved with an injection, but she stated that she would never undergo another injection because it was too painful (*id.*).  Examination revealed no tenderness in her snuffbox or distal radius and a negative Tinel's sign, but she was tender over her wrist flexion crease and had a positive Phalen's test at about 20 seconds.[4]  Dr. Watts referred Plaintiff for electrodiagnostic studies to rule out carpal tunnel syndrome ("CTS") (*id.*).

---

[4] Tinel's sign and Phalen's test are two provocative tests used in the diagnosis of CTS.  *See* http://www.ncbi.nlm.nih.gov/pubmed/1461811 (last visited February 25, 2010).

A rheumatoid factor screen, used in detecting the presence of autoimmune disorders such as lupus, obtained in late July 2004 was negative (that is, it was in the "normal" range) (Tr. 256; *see also* Tr. 276), and bone density scans taken in August 2004 revealed bone mineral density in the lumbar spine and left femur, consistent with osteopenia (Tr. 248).

On August 17, 2004, Plaintiff was seen by Aaron B. Stein, M.D., a pain management specialist, with complaints of pain her neck and shoulders and numbness in her hands (Tr. 203). With the exception of a lack of reflexes in Plaintiff's left biceps and triceps, her physical examination was essentially normal, revealing—among other things—full range of motion in her head, neck, back, and extremities; no trigger points, spasm, or atrophy upon palpation; and no sensory defects to light touch or pinprick (Tr. 204). Dr. Stein's impression was cervicalgia with possible cervical radiculopathy, and he ordered a cervical MRI (Tr. 204–05). Plaintiff returned to Dr. Stein on August 31, 2004, and he advised that the MRI revealed right foraminal narrowing at C3-C4, C4-C5, and C5-C6, but no herniated discs were present (Tr. 201, 206–07). Dr. Stein's impression was cervicalgia with possible cervical radiculopathy, secondary to foraminal stenosis, for which he recommended physical therapy and cervical epidural steroid injections; he also advised Plaintiff to return in one to two months after undergoing the injections (Tr. 202).

Plaintiff returned to Dr. Watts on September 28, 2004, and reported that she did not want to see Dr. Stein again because she believed he did not care about her (Tr. 208). Dr. Watts noted that despite Plaintiff's reports of continued numbness in her hand, she had not obtained the electrodiagnostic studies previously recommended to rule out CTS, and she was encouraged to contact "Dr. Shawbitz" and "get the [] studies done" (Tr. 208). With regard to her shoulder, Plaintiff reported experiencing "a lot less pain in her AC joint" (*id.*). Lastly, Plaintiff told Dr. Watts that she wanted to see "Dr. Buchalter," and Dr. Watts noted that he would "see if [he could] get her a referral to Dr. Buchalter for her cervical spine problems and perhaps some cervical epidurals" (*id.*). Dr. Watts advised Plaintiff to return once had obtained the electrodiagnostic studies (*id.*).[5]

At or near the time Plaintiff saw Dr. Stein and Dr. Watts, Plaintiff presented to Gulf Coast Physician Partners ("GCPP") as a new patient. On February 26, 2004, Plaintiff saw Janice M.

---

[5] The file contains no evidence that Plaintiff sought any further treatment from Dr. Watts or Dr. Stein.

Hudson, M.D. (Tr. 242). Plaintiff reported that she had suffered from chronic insomnia for many years and had taken Elavil, Trazodone, Xanax, Tylenol PM, and Ambien for this condition without success, although she had never undergone a sleep study (*id.*). Plaintiff also reported that she suffered from fibromyalgia and related symptoms such as arthralgia (joint pain) and myalgia (muscle pain) (*id.*). Plaintiff noted no neck pain or stiffness (Tr. 243). A physical examination revealed that Plaintiff's neck was non-tender with no cervical lymphadenopathy, bruits, or masses (Tr. 244). Upper extremity bilateral inspection was normal, as were pulses bilaterally, motor strength (5/5), muscle strength in all muscles, reflexes (2/2), and gait (*id.*). Dr. Hudson's assessment was benign breast disease, lipid disorders, fibromyalgia, and elevated blood pressure without a diagnosis of hypertension (*id.*). Plaintiff was provided with samples of Zanaflex, a medication used for muscle spasms (*id.*). Plaintiff returned to GCPP on April 22, 2004, and again saw Dr. Hudson (Tr. 240). Plaintiff's major complaint was joint pain, and she indicated that she had obtained some relief from Tylenol-Arthritis (*id.*). Plaintiff also complained of arm, hand, wrist, back, and kidney pain and reported concerns of lupus caused by the ruptured silicone implants (*id.*). Additionally, Plaintiff stated that she thought the Zanaflex had been helpful, but that she had run out (*id.*). When Plaintiff returned to GCPP on June 23, 2004, she saw Joyce W. Nichols, ARNP (Tr. 238). Plaintiff complained of "quite a lot of neck pain," primarily on the right side, that sometimes radiated down to the shoulders and right arm and down across the right thoracic paraspinous muscles (*id.*). Plaintiff also reported experiencing stomach problems since taking anti-inflammatory medication. On examination, Plaintiff was in no apparent distress; had full range of motion in the neck, although she exhibited discomfort with rotation to the right or left; had some tenderness to palpation over the cervical paraspinous muscles on the right and over the right trapezius but none over the shoulder joint; normal upper extremity strength and function; and had symmetric deep tendon reflexes (*id.*). On July 22, 2004, Plaintiff returned to GCPP and saw by Angeli D. Saith, M.D. (Tr. 236). Plaintiff reported fatigue, as well as pain in her hands, stomach, buttocks, muscles, neck and shoulders. Examination revealed a positive Tinel's sign and negative Phalen's test (Tr. 237). Dr. Saith noted that Plaintiff would be referred to a pain management specialist for "[c]hronic generalized pain" and to Dr. Watts for treatment of CTS (*id.*). Plaintiff followed up with Dr. Saith on August 10, 2004 (Tr. 221). Although Plaintiff complained of neck pain, her physical examination was normal (Tr.

221–22). Plaintiff was assessed with helicobacter pylori gastritis ("H. pylori") and unspecified lipid disorders (Tr. 222). When Plaintiff returned to GCPP on August 31, 2004, she was again seen by ARNP Nichols (Tr. 217). Plaintiff reported that she had done well while taking a gastric medication but that since stopping the medication her gastritis symptoms had returned; she also reported neck back pain (Tr. 217–18). ARNP Nichols conducted a physical examination and noted tenderness and spasm with palpation over the cervical paraspinous muscles and the posterior aspects of both shoulders, but no "real tenderness over the lateral right shoulder joint" (Tr. 217). Plaintiff was assessed with unspecified lipid disorders, H. pylori, osteopenia, chronic generalized pain, and cervicalgia (*id.*). Lastly, Plaintiff returned to GCPP on September 8, 2004, and again was seen by ARNP Nichols (Tr. 215). Plaintiff reported that she had experienced increased pain in her neck and the posterior aspect of her right shoulder; she also noted that she had scheduled an appointment with Dr. Watts in early October for her CTS and with Dr. Stein in late September for a cervical epidural steroid injection. Additionally, Plaintiff reported that she called Dr. Stein's office due to increasing pain but was told that he did not treat with pain medications. Accordingly, she had come to GCPP "seeking assistance" (*id.*). Plaintiff's physical examination revealed tenderness and spasm with palpation over the cervical paraspinous muscles bilaterally, more pronounced on the right; symmetric deep tendon reflexes in both upper extremities; diminished right grip strength as compared to left; and intact distal circulation and sensation (*id.*). ARNP Nichols, after consulting with "Dr. Brown" (apparently another GCPP physician), advised Plaintiff that GCPP did not provide long-term narcotic pain medication. GCPP would, however, provide Plaintiff with a "one-time" and "short-term" prescription for Lortab, as Plaintiff appeared to be experiencing an acute flare of pain (*id.*). Plaintiff was advised that if she continued to have severe pain which could not be relieved with non-narcotic medication, GCPP would "consider a referral" to a different pain management doctor (*id.*).

On March 10, 2005, Plaintiff began treating with Ronald A. Maddux, M.D., a general practitioner and surgeon (*see* Tr. 324, 375), and he continued treating her through April 2007 (*see* Tr. 425). All of Dr. Maddux's treatment notes are handwritten and difficult to decipher, but they generally reflect that he diagnosed or treated Plaintiff for rheumatoid arthritis, gastric esophageal reflux disease ("GERD"), hypertension, osteoarthritis by history, wrist pain, diverticulosis, high

cholesterol, H. pylori, bilateral CTS; other conditions appear to be noted but the references to them are illegible (*see* Tr. 311–24, 389–95, 425–29). Dr. Maddux's treatment regimen included Decadron (a cortocosteriod administered by injection), Lodine XL (an anti-inflammatory medication), Nexium (an antacid medication), Crestor (a cholesterol-lowering agent), Reglan (a gastric medication), Ultram (a pain reliever), Lortab (a pain reliever, apparently prescribed on only one occasion when Plaintiff reported a flare up in her pain (*see* Tr. 315)), and extra-strength Tylenol; there are references to other prescriptions but they are illegible (*see* Tr. 311–24, 389–95, 425–29). Additionally, Dr. Maddux ordered numerous studies during 2005 and 2006, including an upper GI series and an esophagram/GI series (which revealed a small "sliding type hiatal hernia with minimal reflux-esophagitis" in May 2005 and a small "esophageal hernia with associated reflux-esophagitis" in May 2006); barium enemas (which were ordered due to Plaintiff's complaints of GERD and diarrhea; the enemas were described as "normal" in July 2005 and revealing a polyp in September 2006, although it was noted that Plaintiff had not fasted prior to the 2006 enema, which made reliability of the study "less than optimum"); right shoulder x-ray (which was noted to be unremarkable); thyroid ultrasound (which was noted to be "normal"); CT scan of the neck with IV contrast (which was noted to be "normal"); lumbar spine x-rays (which revealed "slight" degenerative changes and "slight" sclerosis at L5-S1); x-rays of the feet (which revealed bilateral hallux valgus [bunion] deformities); x-rays of the right hand and elbow (which were noted to be "normal"); CT scan of the abdomen (which revealed granulomas); and a CT of the pelvis (which revealed "[q]uestionable small diverticula involving the sigmoid") (Tr. 325–35, 402–05).

Additionally, on May 25, 2006, Dr. Maddux provided testimony at a deposition taken by Plaintiff's counsel, during which he described Plaintiff's impairments and offered opinions regarding Plaintiff's functional capacities and the amount of pain she experiences (Tr. 349–74). In relevant part, Dr. Maddux testified (in response to a multiple-choice question) that Plaintiff experienced pain somewhere between "b" ("pain is present but does not prevent functioning in every day activities or work") and "c" ("pain is present to such an extent to be distracting to adequate performance of daily activities or work") but likely closer to "c" than "b" (Tr. 359–60). In response to another multiple-choice question regarding the extent to which physical activity "such as walking, standing, bending, stooping or moving of extremities" would increase Plaintiff's pain, Dr. Maddux

selected "c," meaning such activity would "greatly increase[] pain and to such a degree as to cause distraction from task or total abandonment of task" (Tr. 360). He advised that he was treating Plaintiff with "pain medications"; and, although Dr. Maddux did not identify the types of medications, he indicated that they were unlikely to be bothersome or interfere with her ability to perform work activity and that Plaintiff had not reported troublesome side effects (Tr. 361–62). Dr. Maddux indicated that it would be difficult to estimate Plaintiff's physical capabilities and that her capabilities would depend on how she was feeling on any given day; he thought, however, that she could probably walk about two hours or less than two hours in a day, sit about two hours, and stand about forty-five minutes (Tr. 362–64). Dr. Maddux also testified that he expected Plaintiff would need to take unscheduled breaks during the workday in order to rest or lie down but that the number of breaks was "hard to quantitate" because it would depend on her condition at the time (Tr. 364–65). Nevertheless, he expected that she would need at least two unscheduled breaks during the day, each of ten-to-fifteen minute duration (*id.*). He further opined that Plaintiff could occasionally lift "less than twenty pounds" (but presumably more than ten (*see* Tr. 365)) and frequently lift "no more than ten pounds" (Tr. 365–66). He opined that Plaintiff would have "significant limitations in performing repetitive reaching, handling or fingering" due to CTS, although he testified that he had never observed such limitations during Plaintiff's examinations (Tr. 366).

C.   Opinions of Consultative Examiners and Non-Examining Agency Physicians/Other Information in Plaintiff's Claim File

On January 12, 2005, a non-examining agency physician, whose full name is not legible, completed a Physical RFC Assessment (Tr. 275–82). The physician opined that Plaintiff was able to occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and stand, walk, or sit six hours in an eight-hour workday (Tr. 276). Plaintiff's ability to push or pull was unlimited, and she had no postural, manipulative, visual, communicative, or environmental limitations (Tr. 276–79).

Plaintiff was examined by Richard W. Lucey, M.D., on May 20, 2005 (Tr. 297). Plaintiff reported neck pain and a "pinched nerve" in her back and noted that she had undergone an epidural block that had "helped" (*id.*). Plaintiff also reported ongoing arthralgia and myalgia in her feet, knees and elbows, which she believed were related to "'silicone poisoning'" (*id.*). A physical examination of Plaintiff's upper extremities revealed normal grip and grip strength (5/5), normal fine

manipulatory movements, some mild diffuse hypertrophic changes in her fingers, full range of movement of all major joints, normal deep tendon reflexes, and no weakness, atrophy, sensory deficits or additional joint deformities (*id.*). Her neck was supple with a full range of motion and no bruits (Tr. 297, 300). Examination of her lower extremities revealed moderate hypertrophic changes in the knees, mild crepitus in the knees, mild to moderate bilateral hallux valgus deformities of the feet, no edema or varicosities, intact peripheral circulation, full range of movement of all major joints, and negative straight leg raise to full extension while sitting and to 60 degrees while supine (Tr. 298). Examination of the back revealed an erect posture, normal gait, and normal heel, toe and tandem walking without evidence of weakness or ataxia; Plaintiff transferred from supine to sitting without subjective discomfort; range of movement of the lumbar spine was slightly diminished, but range of movement of the cervical spine was normal (Tr. 298, 300). Dr. Lucey's assessments were cervical disc disease with history of radiculopathy in remission, degenerative arthritis in the hands and knees, history of polyarthralgias and myalgias possibly associated with previous leakage of silicone implants, history of mild chronic depression, and possible CTS in the right wrist, noting that Plaintiff had a very mildly positive Tinel's sign on the right (Tr. 299).

Michael Kasabian, D.O., another non-examining agency physician, completed a Physical RFC Assessment on June 22, 2005 (Tr. 303–10). Dr. Kasabian's opinions are identical to those rendered by the other agency physician on January 12, 2005 (*see id.*).

On December 11, 2006, Plaintiff was examined by C.W. Koulisis, M.D., an orthopaedic surgeon (Tr. 407). Dr. Koulisis indicated that he had reviewed Plaintiff's file in detail and that all pertinent data was incorporated into his report, including the medical records of Dr. Watts and Dr. Lucey (*id.*). He noted that Plaintiff had a single epidural injection of the lumbar spine and no clear upper or lower extremity radicular component (*id.*). Plaintiff's chief complaint was pain in numerous areas of her body, including her neck, shoulders, elbows, hands, low back, hips, and right knee and heel (*id.*). Dr. Koulisis noted that Plaintiff arose without difficulty and upon standing had normal cervical lordosis, thoracic kyphosis, and lumbar lordosis (Tr. 408). She had a normal gait and could heel, toe and tandem walk without difficulty (*id.*). Examination of the cervical spine

revealed a negative Spurling's test,[6] no palpable spasm, normal motor strength (5/5), normal reflexes ("2+ and equal"), and intact sensation to light touch, pinprick, and vibration (*id.*). Examination of her shoulders revealed a negative sulcus sign, negative impingement sign, and negative provocative testing confined to the supraspinatus (*id.*). Plaintiff's elbows were stable to all stresses with negative Tinel's signs overlying the cubital tunnel bilaterally, and her wrists and hands were also stable to all stresses, with negative Tinel's signs, Phalen's tests, and Finkelstein's tests[7] bilaterally (*id.*). Examination of the thoracolumbar spine revealed no palpable spasm, normal motor strength (5/5), normal reflexes ("2+ and equal"), and intact sensation to light touch, pinprick, and vibration (*id.*). Plaintiff also exhibited negative tension signs bilaterally, while seated and supine, and negative provocative testing confined to the sacroiliac joints bilaterally (*id.*). Plaintiff's hips were noted as smooth with a normal and symmetric range of motion (Tr. 408, 411). Examination of the knees revealed no effusion bilaterally; normal patellofemoral mechanics throughout the range of motion bilaterally; stability as to all stresses, including anterior drawer, posterior drawer, Lachman's, varus stressing, and valgus stressing; negative McMurray's test, and negative Apley's grind test.[8] Her ankles and feet were stable to all stresses throughout the range of motion and had normal ranges of motion (*see* Tr. 408, 411–12). Indeed, range of motion was noted to be normal in all but one area tested, including the cervical spine, lumbar spine, elbows, hands and wrists; Plaintiff's knee range of motion was slightly limited at 0-130 degrees ("normal" is 0-150 degrees) (*see* Tr. 410–12). Dr. Koulisis commented that cervical spine x-rays revealed "moderate" degenerative changes throughout the cervical segments, and lumbar spine x-rays revealed "mild" degenerative changes

---

[6] The Spurling's test is an "evaluation for cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain." http://www.medilexicon.com/medicaldictionary.php?t=90833 (last visited February 25, 2010).

[7] Finkelstein testing "is used to detect de Quervain tenosynovitis in which the thumb is flexed into the palm and is covered by the remaining four digits; the wrist is then bent toward the ulna; positive result of test produces pain and crepitus along the path of the involved tendon." http://www.medilexicon.com/medicaldictionary.php (last visited February 25, 2010).

[8] McMurray's testing involves "rotation of the tibia on the femur to determine injury to meniscal structures." http://www.medilexicon.com/medicaldictionary.php?t=90652 (last visited February 21, 2010). Apley's Grind testing, likewise, is used to detect meniscal injury. *See, e.g.*, http://www.fpnotebook.com/Ortho/Exam/AplysCmprsnTst.htm (last visited February 25, 2010).

most pronounced in the lower segments (Tr. 409). His impressions were degenerative cervical disc disease and complaints of polyarthralgias and myalgias, and he commented as follows:

> [Plaintiff] complains of 'multiple medical problems.' She has a history of complaining of polyarthralgia and myalgia which she attributed to 'silicone leakage.' This is extremely unlikely. She complains of neck pain, no true upper or lower extremity radiation. Objectively she does have degenerative changes in the cervical spine moderate.

(*id.*).

On a Medical Source Statement of Ability to do Work-Related Activities (Physical), Dr. Koulisis opined that Plaintiff could occasionally lift or carry fifty pounds and frequently lift or carry twenty-five pounds (Tr. 413). He further opined that Plaintiff had no limitations in her ability to sit, stand, or walk, but her ability to push or pull was restricted due to her degenerative disc disease, degenerative joint disease, and cervical and lumbar spine issues (the precise restriction is illegible) (Tr. 414). Next, Dr. Koulisis opined that Plaintiff could occasionally climb and frequently balance, kneel, crouch, crawl, and stoop (*id.*). Lastly, he opined that Plaintiff had no manipulative limitations (such as reaching, fingering, feeling, and performing gross or fine manipulation), visual or communicative limitations, or environmental limitations, except with regard to exposure to vibration (Tr. 415–16).

A vocational expert ("VE"), who had reviewed Plaintiff's file and heard Plaintiff's hearing testimony, testified at Plaintiff's hearing before the ALJ. In relevant part the VE characterized Plaintiff's past work as an apartment complex manager as light and skilled, as a maintenance person as medium and semi-skilled, as a manager of retail stores as light and skilled, as an assembly-line worker as medium and unskilled, in the hair salon as light and semi-skilled, and as a cashier as light and semi-skilled (Tr. 484). The VE testified that Plaintiff was capable of performing the full range of light work and that she could perform her past relevant work ("PRW") (*id.*). The VE testified, though, that if Dr. Maddux's opinions regarding Plaintiff's functional capacities were accepted, Plaintiff would be limited to "less than sedentary" work, and no such work would be available (Tr. 484–85). Likewise, if Plaintiff's testimony (as summarized, *infra*) was fully credited she would be unable to perform any work (Tr. 485).

V.    DISCUSSION

Plaintiff asserts that she raises only three grounds for relief in the instant appeal, as follows: 1) the ALJ improperly dismissed Plaintiff's subjective testimony  2) the ALJ improperly rejected the opinions of Dr. Maddux, a treating physician, and 3) the ALJ failed to fully and fairly develop the medical evidence (Doc. 18 at 3).  A closer review of Plaintiff's brief, however, reveals that Plaintiff has actually raised approximately seven grounds for relief.[9]  For example, in addition to the three listed grounds, Plaintiff contends the ALJ erred in preventing her attorney from asking leading questions during her administrative hearing, and she appears to raise a claim of ALJ bias (*see id.* at 10 (where Plaintiff alleges, among other things, that "this ALJ seems to be intent on bullying claimants and their representatives")).  Plaintiff also—in discussing the ALJ's consideration of the opinions of Dr. Maddux—includes numerous assertions of error.  Specifically, Plaintiff alleges the ALJ erred in 1) failing to fully develop the record because he did not recontact Dr. Maddux, 2) sending Plaintiff for a consultative examination without recontacting Dr. Maddux, 3) accepting the opinions of Dr. Koulisis over those of Dr. Maddux, 4) finding that Plaintiff could perform her past relevant work (because this finding is based on the ALJ's rejection of Dr. Maddux's opinions), and 5) articulating only one reason for rejecting Dr. Maddux's opinions.  Thus, for organizational purposes, in addressing Plaintiff's claims the undersigned has rearranged, and where appropriate, combined the claims.

A.      Plaintiff's Credibility

Plaintiff alleges the ALJ erroneously discounted her testimony concerning pain and other symptoms, as provided at her hearing held July 27, 2007 (*see* Doc. 18 at 9–10), while the Commissioner contends the ALJ made no such error (Doc. 23 at 9–13).  Specifically, the Commissioner asserts that the ALJ employed the proper procedures in evaluating Plaintiff's testimony and that his findings are substantially supported by the record.

As this court is well aware, pain and other subjective complaints are treated by the Regulations as symptoms of disability.  Title 20 C.F.R. § 404.1529 provides in part that the

---

[9]  The court is well-familiar with memoranda filed by Plaintiff's counsel in other Social Security appeals. Counsel typically employs the sort of style described above, which makes the review of claims more difficult and time consuming than should be necessary.  Review is further complicated in the instant case because Plaintiff's counsel—after listing the "three" grounds for relief noted above—discusses the grounds in only two sections of the brief and labels the sections as "a" and "e" (*see* Doc. 18 at 3–9, 9–16).

Commissioner will not find disability based on symptoms, including pain alone, "unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." The Eleventh Circuit has articulated a three-part pain standard, sometimes referred to as the <u>Hand</u> test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

<u>Hand v. Heckler</u>, 761 F.2d 1545, 1548 (11th Cir. 1986) (originally adopting the three-part pain standard). The Eleventh Circuit continues to follow the <u>Hand</u> test. <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991); <u>Ogranaja v. Commissioner of Social Security</u>, 186 Fed. Appx. 848, 2006 WL 1526062, at *3 (11th Cir. June 5, 2006) (quoting <u>Wilson</u>); <u>Elam</u>, 921 F.2d at 1216.

Underlying the <u>Hand</u> standard is the need for a credibility determination concerning a plaintiff's complaints. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain [or other symptom]." <u>Scharlow v. Schweiker</u>, 655 F.2d 645, 649 (5th Cir. Sept. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints"). People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed symptom]. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts to ensure that the finding is supported by substantial evidence." <u>Hand</u>, 761 F.2d at 1548–49. It is within the ALJ's "realm of judging" to determine whether "the quantum of [symptoms a claimant] allege[s] [is] credible when considered in the light of other evidence." <u>Arnold v. Heckler</u>, 732 F.2d 881, 884 (11th Cir. 1984). The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

Review of Plaintiff's testimony provides a helpful context in considering the instant claim. In relevant part, Plaintiff testified that she stopped working as an apartment complex manager and maintenance person because she could no longer perform the duties required by her job, which included painting, cleaning, plumbing work, and inspecting and readying apartments for new tenants (Tr. 450–52). Her less-strenuous duties included processing paperwork, collecting rent, ordering supplies, and making bank deposits, but Plaintiff appears to have testified that she could no longer perform those duties either because of the "sitting" requirements (*see* Tr. 450–51). Plaintiff explained that when she first began working at the apartment complex, she performed only managerial duties, but when the maintenance man quit in approximately June or July of 2004, she was required to assume his duties until a replacement was hired approximately one year later (*see* Tr. 455). When the replacement was hired Plaintiff resumed her work as a manager and no longer performed maintenance duties, but she quit the job on December 15, 2005, because she did not like the new owners (Tr. 459). Thereafter Plaintiff looked for work as a cashier and manager but stated she could not perform the "long standing, [] lifting, [and] bending" requirements of those jobs due to "the sciatic nerve in [her] hip" and her arthritis, tendonitis, fibromyalgia, CTS, neck pain, and back problems (Tr. 460). In response to a question asking whether Plaintiff could perform any work, Plaintiff stated, "I can't do what I used to be able to do," noting that she has pain in her feet, knees, back, hip, and if she lifts in her shoulders (Tr. 473).[10] Plaintiff similarly noted that she "can not physically do what [she] has done all [her] life" due to pain, although she explained that she takes Aleve, an over-the-counter pain medication, which largely relieves her pain if she takes it every four to six hours (Tr. 465–66). Plaintiff described the pain in her feet as feeling "like somebody has 10,000 needles sticking in my heels" and stated she had experienced this type of pain for "about a year" (or from approximately July 2006 to July 2007) (Tr. 473). Regarding her knee pain and swelling, Plaintiff noted that her knees swell every day, and the pain is constant and feels like "someone has something in there pushing them out. It's stiffness." (Tr. 474). To lessen her knee discomfort and relieve swelling, Plaintiff takes Aleve, elevates her feet for forty-five minutes to an

---

[10] Plaintiff subsequently testified that her "aching and burning" shoulder pain is "constant," as opposed to being "brought on by activity" while noting that the shoulder pain is aggravated by lifting or stretching (Tr. 477–78).

hour, and sometimes wraps towels around her knees that have been soaked in salt water (Tr. 474). Plaintiff also reported experiencing burning and aching back pain, and dull and piercing back pain if she bends over, for "[a] little over a year," although prior to that time she experienced back pain to a lesser degree (*see* Tr. 475). Plaintiff also stated that pain related to the sciatic nerve in her hip is like a "piercing knife" and brings tears to her eyes (Tr. 476).

With regard to physical capacities, Plaintiff estimated that she could reach overhead "to a certain point" (meaning that she could not reach overhead for any length of time or while "hold[ing] anything up"); lift ten to fifteen pounds overhead; sit fifteen to thirty minutes, depending on the pain, before needing to shift "back and forth" (noting that as a result of sciatica she experiences shooting pain, numbness in her legs, and swelling in her knees and feet when she sits); sit continuously for forty-five minutes to an hour if she is able to shift when necessary, but would then need to get up and move around for about fifteen to twenty minutes before sitting again; stand continuously for one to two hours; walk approximately fifty to 100 yards before needing to sit and rub her legs (for approximately fifteen to twenty minutes before she can walk again); and perform activities around the house for thirty to thirty-five minutes before needing to sit down for ten to fifteen minutes (Tr. 478–79).

In discounting the foregoing complaints, the ALJ referenced 20 C.F.R. § 404.1429(c) and applied the correct standard, an issue that is not in dispute here. Rather, Plaintiff contends the reasons cited by the ALJ for discrediting her testimony lack substantial support in the record. Thus, in considering Plaintiff's claim, the court addresses each reason cited by the ALJ.

The ALJ first found that Plaintiff "has had no hospitalizations for the pain alleged or referral to a pain clinic" (Tr. 35). Plaintiff contends that the ALJ's statement regarding hospitalizations "borders on the ridiculous" because the applicable Regulations and law do not require hospitalizations in order for a claimant's complaints of pain to be accepted as true (Doc. 18 at 11–12). The undersigned, however, does not interpret the ALJ's statement as meaning that a claimant's complaints of pain can never be accepted as true unless the claimant has been hospitalized for pain. Rather, when the statement is considered with the ALJ's opinion as a whole, it is evident that the ALJ was commenting on Plaintiff's lack of anything other than conservative care for her impairments, a factor he could properly consider in evaluating her credibility. *See*

Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996) (ALJ may consider treatment that is "entirely conservative in nature" in discrediting a claimant's testimony); Miller v. Astrue, Case No. 8:07cv2074, 2009 WL 35167, at *5 (M.D. Fla. January 6, 2009) (same); Woodum v. Astrue, Case No. 8:07cv404, 2008 WL 759310, at *3 (M.D. Fla. March 20, 2008) (ALJ properly considered that "limited and conservative treatment . . . is inconsistent with the medical response that would be expected if the physician(s) found the symptoms and limitations to be as severe as reported by the claimant"). Moreover, the ALJ's finding is substantially supported by the record because (other than Plaintiff's earlier breast-related surgeries) the record reflects no surgeries, hospitalizations, or significant treatment for Plaintiff's impairments; rather, Plaintiff was treated conservatively with injections, medication (both prescribed and over-the-counter), towel wraps, and rest, among others modalities.

As for the ALJ's statement regarding the lack of referrals to a pain clinic, Plaintiff asserts the ALJ is simply wrong because Plaintiff was "apparently" referred to Dr. Buchalter and treated by Dr. Stein, both of whom are pain management physicians (Doc. 18 at 11–12). Contrary to Plaintiff's assertion that "it appears that [Plaintiff] was [] seen . . . by Dr. Jeff Buchalter," the court has found no such evidence in the record. Moreover, the only evidence Plaintiff has pointed to in support of this assertion is a treatment note by Dr. Watts dated September 28, 2004, indicating that Plaintiff "wants to see Dr. Buchalter" and that he (Dr. Watts) would "see if [he could] get her a referral to Dr. Buchalter for her cervical spine problems and perhaps some cervical epidurals" (Tr. 208).[11] There simply is no evidence, however, suggesting that Dr. Watts (or any other physician) actually referred Plaintiff to Dr. Buchalter, and no evidence demonstrating that Plaintiff was ever seen or treated by Dr. Buchalter during the relevant time frame.[12] Although the ALJ's statement is

---

[11] It should also be noted that at the same September 2004 visit, Dr. Watts emphasized to Plaintiff the importance of obtaining electrodiagnostic studies (to better evaluate the numbness in her hands) and returning to him after she had done so. Plaintiff never returned to Dr. Watts after this visit, and it does not appear that she ever obtained the recommended studies.

[12] Plaintiff testified that she saw a "Dr. Burkholter" twice, she believes, in 1995 or 1996 (Tr. 475), but it is unclear whether this person is the same as the "Dr. Buchalter " referenced in the instant appeal. Notwithstanding, there are no records in Plaintiff's file under either name, from the relevant time frame or from the mid-1990s, and no records documenting an actual referral to either "Dr. Burkholter" or "Dr. Buchalter" for treatment.

not completely accurate because Plaintiff was, on one occasion, referred to Dr. Stein, the ALJ's credibility finding should nevertheless be affirmed.[13]

Initially, Dr. Saith agreed to refer Plaintiff to Dr. Stein after seeing her as a patient only one time. Thereafter, Plaintiff was seen by Dr. Stein on only two occasions, August 17 and 31, 2004 (Tr. 203, 201). After Dr. Stein conducted essentially normal physical examinations and reviewed the results of a cervical MRI, he recommended physical therapy, cervical epidural steroid injections, and that Plaintiff return in one to two months after undergoing the injections (Tr. 202). Plaintiff did not obtain the recommended injections and did not return to Dr. Stein. Moreover, Plaintiff offered a curious explanation to Dr. Watts as to why she would not thereafter return to Dr. Stein (that is, because she believed Dr. Stein did not care about her) (Tr. 208). Dr. Stein's office notes, however, do not substantiate Plaintiff's explanation, as they suggest that his interactions with Plaintiff were pleasant, and they reflect that he recommended certain treatments to try to help Plaintiff; he also wished for Plaintiff to continue as a patient, as he advised her to return (*see, e.g.*, Tr. 202–04). Furthermore, in September 2004 Plaintiff told ARNP Nichols at GCPP that she called Dr. Stein's office due to increasing pain but was told that he does not treat with pain medications (Tr. 215). Thus, it appears that Plaintiff failed to return to Dr. Stein—not because she truly felt he did not care about her—because she wanted to be treated with narcotic pain medication instead of the treatment course he recommended. Likewise, Dr. Brown (and ARNP Nichols) at GCPP did not believe that Plaintiff's condition required the use narcotic pain medication, reluctantly administered one Lortab prescription—and one prescription only—after concluding that Plaintiff was experiencing a "flare up"of pain, and did not refer Plaintiff to a pain management physician despite Plaintiff's desire for such a referral. Indeed, after being informed in September 2004 that—at most—GCPP would "consider" referral to a different pain management physician if it was later determined that non-narcotic pain relievers were ineffective (*see* Tr. 215), Plaintiff discontinued treatment at GCPP and began treatment with Dr. Maddux (who, incidentally, also did not refer Plaintiff to a pain management physician). Thus, the record largely supports the ALJ's finding that Plaintiff's treating physicians did not refer her for pain management. The record also supports a finding that Plaintiff's

---

[13] Although Plaintiff has not pointed this out, the court notes that on July 22, 2004, Dr. Saith indicated that Plaintiff would be referred to a pain management specialist (Tr. 237).

condition did not require referral to or long-term treatment by a pain management physician, to the extent such treatment involved the long-term or regular use of narcotic pain medications.

The ALJ's second reason for discounting Plaintiff's complaints is similar to the first: he found that Plaintiff had "no continuing medical regimen requiring the use of prescription strength medication" and the "lack of use of prescription pain medication on a regular and persistent basis significantly diminishe[d]" Plaintiff's credibility "with respect the severity, frequency, and duration of her alleged symptomatolgy" (Tr. 35). The record substantially supports this finding as well. As the ALJ noted, Plaintiff testified at her hearing held July 27, 2007—a time when her pain, including her heel, back, and foot pain, was allegedly at its worst (having intensified during the previous year according to Plaintiff's testimony)—that Aleve, an over-the-counter medication, controlled her pain (Tr. 34, 465–66). Plaintiff testified that her other medications included Nexuim (for acid reflux), Effexor (for depression), and Seroquel (a sleep aid), as well as over-the-counter medications (in addition to Aleve) including Mylanta and Maalox, but she did not testify that she was taking any narcotic pain medications (*see* Tr. 462–65). Moreover, Plaintiff reported to Dr. Koulisis in December 2006 that she was taking only Nexium, Zetia (for high cholesterol), and Atarax (an antihistamine) (Tr. 407). Additionally, treatment records reveal that Plaintiff was prescribed anti-inflammatory medications and advised to take extra-strength Tylenol, and although Plaintiff was apparently prescribed Lortab, it appears to have rarely been prescribed, on a short-term basis, and only in response to Plaintiff's reported "flare-ups" of pain. Furthermore, as previously discussed, the record demonstrates Plaintiff's desire for stronger pain medication, but her requests were—for the most part—denied. Thus, her own physicians did not believe her condition was severe enough to warrant a continuing course of narcotic pain medication. Lastly, with regard to Dr. Maddux, although he testified that Plaintiff took "pain medications," his treatment notes (which are, admittedly, difficult to decipher) do not appear to reflect "prescription[s] [for] pain medication on a regular and persistent basis," as the ALJ found, and Dr. Maddux's testimony suggests that Plaintiff was not regularly prescribed such medications because he noted, essentially, that Plaintiff reported no troublesome side effects and that the medications she took would not be expected to cause such side effects or interfere with her ability to perform work activities (as might be the case if she

regularly and persistently took potent pain medications).[14]  As noted *supra*, an ALJ may consider treatment that is "entirely conservative in nature," including the use of mild or over-the-counter pain medication, in discrediting a claimant's testimony.  Wolfe, 86 F.3d at1078.  Thus, the ALJ did not err, as he properly considered this factor, and his finding is substantially supported by the record.

Next, the ALJ noted that Plaintiff's complaints of disabling pain and other symptoms are belied by her reported daily activities (Tr. 36) and, the court notes, by her activities as observed or described by others.  This finding, too, is supported by the record and was properly considered by the ALJ.  20 C.F.R. § 404.1529(c)(3)(i)); *see also* Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987).  As the ALJ noted, Plaintiff testified that she was able to cook, do laundry, and shop (Tr. 36; *see also* Tr. 468).  Plaintiff additionally testified that she feeds the "cattle dog" (an "outside only" dog), and cleans the house, and she noted that only activities she can not perform are painting, mowing, climbing, lifting, and scrubbing the carpets (Tr. 467–68).  The record also reflects, as the ALJ noted, other instances where Plaintiff reported performing similar physical activities, but she suggested she was limited in her ability to perform those activities (Tr. 36).  For example, in September 2004 Plaintiff reported to an SSA examiner that she "still does shopping, cooking, house cleaning, driving, laundry, and mows the lawn," but she stated she can perform each of these activities for only about an hour before needing to rest due to pain; in December 2004 Plaintiff reported that she can "still wash dishes, vacuum and cook[,] . . . go shopping and does not need any assistance in personal care" and "can even cut the lawn," but she can only perform each activity, except perhaps vacuuming, for an hour before needing to rest due to pain (Tr. 123, 258).  Although Plaintiff's earlier descriptions of her activities show some limitations, the ALJ was not required to believe all of her assertions concerning her activity-related limitations.  *See* Johnson v. Chater, 87

---

[14]  The court notes that Plaintiff occasionally reported taking Darvocet for pain, but the undersigned has not found in the record clear evidence that Darvocet prescriptions were provided to her.  For example, Plaintiff reported to an SSA examiner in September 2004 that she was taking "Ultram and Darvocet, along with [over-the-counter] [A]dvil, [T]ylenol, and Motrin for pain" (Tr. 123), but this report was made at or near the time Plaintiff was treated at GCPP, and its notes do not reflect prescriptions for either Darvocet or Ultram, although Dr. Maddux's later treatment notes reflect prescriptions for Ultram.  Notwithstanding, the undersigned's conclusion remains the same, as the treatment notes prior to Dr. Maddux's treatment clearly do not reflect prescriptions for potent pain medications, and although Dr. Maddux's handwritten and somewhat illegible notes may reflect occasional prescriptions for stronger medications, overall the record supports the ALJ's finding that Plaintiff's treatment was largely conservative in nature and did not require a continuing medical regimen requiring the use of prescription strength medication.

F.3d 1015, 1018 (8th Cir. 1996). Similarly, it was within the ALJ's realm of judging to choose to credit Plaintiff's testimony under oath—which did not include restrictions with regard to cooking, doing laundry, shopping, feeding the outside dog, and cleaning the house (other than scrubbing carpets)—over Plaintiff's earlier reports of more limited abilities to perform such activities. Additionally, other evidence in the record supports the ALJ's finding regarding Plaintiff's daily activities, including an observation by an SSA representative during an August 2004 "face-to-face" interview with Plaintiff, that she had no difficulty sitting, standing, or walking; a report by Plaintiff in October 2004, when she was working part-time as an apartment complex manager, that she "still do[es] her daily chores and cares for herself"; a report by Plaintiff's boyfriend in January 2005 that Plaintiff "still goes shopping, driving, and does chores around the house," still manages her own funds and bills, and is "still social";[15] a report by Plaintiff in April 2005 that she is able to fully take care of herself, including dressing, bathing, caring for her hair, shaving, etc.; a report by Plaintiff in March 2006 that she was working in the yard; Plaintiff's ability to work, albeit part time, through mid-December 2005; and the results of Plaintiff's consultative physical examinations (Tr. 88, 124, 125, 132, 312). Lastly, the undersigned notes, even if Plaintiff actually needed to rest some after one hour of physical activity, such as mowing the lawn, Plaintiff's reported ability to perform such an activity for one hour without rest is seemingly inconsistent with the disabling limitations she has alleged.

In conclusion, the undersigned finds that the ALJ articulated the inconsistencies on which he relied in discrediting Plaintiff's subjective complaints of pain, and his findings are supported by substantial evidence on the record as a whole; therefore, the ALJ's credibility finding should be affirmed. *See* Foote, 67 F.3d at 1561–62 (a clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court).

A final contention, however, must be addressed. In discussing the ALJ's consideration of Plaintiff's credibility, Plaintiff contends that the ALJ erred in preventing her attorney from asking

---

[15] The court notes that on December 1, 2004, Plaintiff reported that she has no friends, visits no one, and does not go to church, and that she made similar reports during her testimony before the ALJ; Plaintiff's reports, however, appear inconsistent with her boyfriend's report regarding her social life (Tr. 258, 468–69).

her leading questions during her hearing.[16] As previously noted, Plaintiff's attorney elicited from Plaintiff testimony regarding her physical capacities, including her ability to reach overhead lift, sit, walk, and perform activities around the house. Plaintiff's attorney was not permitted to ask two leading questions, but counsel was nevertheless able to elicit the same testimony she attempted to elicit through the first leading question by rephrasing the question (*see* Tr. 479–80). As to the second leading question, concerning whether Plaintiff napped during the day, counsel did not attempt to rephrase the question and an answer was never obtained. The court, however, finds no error, as Plaintiff was provided with ample opportunity to explain her limitations, including her need to nap—if such a need indeed existed—in response to other questions that were permitted by the ALJ. Moreover, the undersigned can envision no scenario where Plaintiff's response to that question would have changed the ALJ's ultimate findings.[17]

To the extent Plaintiff asserts, that but for the ALJ's limiting of her counsel's questioning, her hearing testimony would have been consistent with her earlier reports of daily activities—a very liberal construction of Plaintiff's claim—the court disagrees. Although counsel was restricted from asking certain questions, counsel was not restricted by the ALJ during that portion of Plaintiff's testimony concerning "activities [she was] able to do around the house" (Tr. 481). And even though counsel was not restricted, counsel did not ask specific questions regarding Plaintiff's ability to clean, cook, feed the dog, or any other household activity mentioned by Plaintiff earlier in her testimony. Thus, the ALJ's conduct had no bearing on the issue of Plaintiff's ability to perform such activities, and any suggestion that, but for the ALJ's conduct Plaintiff's testimony would have been consistent with her earlier reports, is pure speculation and indeed unsupported by the transcript of Plaintiff's hearing. It is more likely that counsel chose to end this line of questioning when Plaintiff responded to a question asking how long she could perform "activities . . . around the house" by stating only thirty to thirty-five minutes, which is inconsistent with all other reports made by

---

[16] Plaintiff's contention is best addressed here because the conduct of the ALJ at issue occurred during Plaintiff's testimony and that testimony was subsequently discredited by the ALJ.

[17] For example, Dr. Maddux testified that Plaintiff would need breaks during a workday to "rest or lie down" (Tr. 364), but this opinion was properly discounted by the ALJ, as discussed *infra*, for reasons that would equally support discrediting any assertion by Plaintiff that she needed to nap.

Plaintiff concerning such household activities. Thus, the court finds no error, as the ALJ's prohibiting—whether rightly or wrongly—two leading questions had no bearing on his credibility findings.

Lastly, to the extent Plaintiff is asserting a claim of ALJ bias, she is not entitled to relief. There is no doubt from a review of the transcript that the ALJ was needlessly abrupt with both counsel and Plaintiff. While the court does not condone such conduct, the ALJ's conduct here does require reversal of his decision. *See, e.g.*, Liteky v. United States, 510 U.S. 540, 555–56, 114 S. Ct. 1147, 1157,127 L. Ed. 2d 474 (1994) (a judge's "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display" are not enough to establish bias); *see also* Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) ("In light of the ALJ's detailed and reasoned written grounds for ruling against Bayliss, we conclude that the statements in the ALJ's opinion in which the ALJ expressed displeasure with the conduct of Bayliss's counsel are not sufficient to establish bias."). Plaintiff must show that the ALJ's behavior, in the context of the whole case, was "so extreme as to display clear inability to render fair judgment." Liteky, 510 U.S. at 551, 114 S. Ct. 1147. Plaintiff has pointed to nothing in the record that rises to this level, and the court has found none.

B.      The Opinions of Dr. Maddux

Plaintiff's remaining claims all, in way or the other, relate to the ALJ's rejection of the opinions of Dr. Maddux, a treating physician. Thus, the remaining claims will be discussed together, after a synopsis of the applicable law is provided.

1.      Weighing Medical Opinions

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis v. Callahan, 125 F.3d 1436, 1439-1441 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Chater, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to

work if it is unsupported by objective medical evidence or is wholly conclusory. *See* <u>Edwards</u>, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

Where substantial record evidence supports the ALJ's decision to discount a treating physician's opinion, the opinion of an examining physician itself becomes entitled to significant weight. *See* <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (report of consultative examiner may constitute substantial evidence supportive of a finding adverse to a claimant); 20 C.F.R. § 404.1527 (every medical opinion should be evaluated, and unless a treating source's opinion is given controlling weight, the following factors are considered in deciding the weight to be given to any medical opinion: examining versus non-examining; treatment relationship, including length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship; supportability of the opinion(s); consistency with the record as a whole; specialization; and "other factors").

2.      Developing the Record

It is well established in this Circuit that the ALJ has an affirmative duty to develop a full and fair record because a hearing before an ALJ is not an adversary proceeding. <u>Brown v. Shalala</u>, 44 F.3d 931, 934 (11th Cir. 1995); <u>Lucas v. Sullivan</u>, 918 F.2d 1567, 1573 (11th Cir. 1990); <u>Smith v. Bowen</u>, 792 F.2d 1547, 1551 (11th Cir. 1986); <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981). A record is full and fair, and need not be further developed, if the ALJ has sufficient evidence to decide the case. <u>Graham v. Apfel</u>, 129 F.3d 1420, 1423 (11th Cir. 1997) (holding that where the record is complete and adequate to make a decision, no showing of prejudice is made). The seminal cases in this circuit on the ALJ's duty to develop the record are <u>Ford v. Secretary of Health and Human Services</u>, 659 F.2d 66 (5th Cir. Unit B Oct. 15, 1981) and <u>Reeves v. Heckler</u>, 734 F.2d 519 (11th Cir. 1984). Both held that it is not necessary for the ALJ to order a consultative examination unless the record established that such an examination was necessary to enable the ALJ

to make a decision. Where the has sufficient information to decide the case the ALJ can do so. Graham, 129 F.3d at 1423. In considering whether the record is fully developed, this court should be guided by whether the record reveals evidentiary gaps which result in unfairness or "clear prejudice." Brown, 44 F.3d at 934–35.

        3.     Discussion

In the instant case, the ALJ acknowledged Dr. Maddux's status as a treating physician and noted that, ordinarily, his opinions would therefore be accorded more weight. The ALJ rejected the opinions Dr. Maddux provided during his deposition testimony, however, on the grounds those opinions were not supported by his treatment records and were not consistent with the record as a whole (Tr. 25). These factors were properly considered by the ALJ. *See, e.g.,* Phillips, 357 at 1240-41; *see also* Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (citing Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (lack of any significant restrictions imposed by treating physicians supported the ALJ's decision of no disability)); Singleton v. Astrue, 542 F. Supp. 2d 367, 378–79 (D. Del. 2008) (in evaluating a plaintiff's credibility, ALJ did not err in considering, among other factors, that "none of [p]laintiff's treating physicians identified any specific functional limitations arising from her fibromyalgia or other conditions that would render her totally disabled"). The question thus becomes whether the ALJ's findings regarding "supportability" and "consistency" are supported by the record.

The undersigned has found nothing in Dr. Maddux's treatment records that supports his later deposition testimony regarding Plaintiff's restrictions. For example, his records do not reflect that he imposed any physical restrictions or limitations upon Plaintiff, work-related or otherwise. Likewise, he does not appear to have recorded any complaints or limitations reported by Plaintiff that might support his later deposition testimony (such as his testimony that Plaintiff could probably only walk or sit about two hours in a day and stand for only forty-five minutes in a day).

Regarding consistency with the record as a whole, the ALJ correctly noted that Dr. Maddux's opinions were inconsistent with those of Dr. Koulisis, a board-certified orthopaedic surgeon, and Dr. Lucey, both of whom physically examined Plaintiff (Tr. 25). Indeed, as fully detailed *supra*, the physical examinations conducted by both Dr. Koulisis and Dr. Lucey were essentially normal and suggest that Plaintiff is not as physically limited as she and Dr. Maddux have stated. Dr. Koulisis,

a specialist in the relevant field, was well aware that cervical spine x-rays revealed degenerative changes throughout the cervical segments, but he described those changes as "moderate"; likewise, he noted that lumbar spine x-rays revealed degenerative changes, but he described the changes as "mild." And, with full knowledge of the x-ray results and after personally examining Plaintiff, he opined in relevant part that she was capable of lifting and carrying up to fifty pounds and had no limitations in her ability to sit, stand, or walk. As noted, Dr. Maddux is a general practitioner and surgeon and, therefore, less qualified to interpret (or extrapolate from) cervical and lumbar spine x-rays; indeed, the opinions he offered during his deposition are somewhat equivocal in this regard.[18]

In further discounting Dr. Maddux's opinions the ALJ noted that his own testimony was inconsistent with the disabling limitations he assessed, as were the results of certain objective tests (*see* Tr. 24–25). In support the ALJ noted Dr. Maddux's testimony that an RF factor test (used in detecting the presence of rheumatoid arthritis) was negative, a shoulder x-ray was normal, and an x-ray of the right hand was normal (indeed, Dr. Maddux specifically testified that "even though she is complaining of pain in her hand, nothing is showing" on the x-ray) (Tr. 25–26, 357–59). Notwithstanding, as the ALJ noted, Dr. Maddux opined that Plaintiff would have problems handling, fingering, or with fine manipulation despite having never observed such limitations and despite the right-hand x-ray results (Tr. 26, 366). The ALJ also noted Dr. Maddux's testimony that Plaintiff's hypertension was well-controlled, as was her elevated cholesterol (Tr. 25, 353–54). Dr. Maddux also testified that Plaintiff had not recently undergone injections, including those recommended by other physicians, although she had done so in the past; that Plaintiff was not presently experiencing problems related to silicone leakage; and that she had full ranges of motion "on pretty much all of [her] joints" (Tr. 25–26, 355–57).

The ALJ also noted that Dr. Maddux had trouble quantifying Plaintiff's limitations (Tr. 26). While some of Dr. Maddux's difficulty may be attributable to his belief that Plaintiff's condition varied from day to day, overall his testimony is equivocal. As the ALJ pointed out, some of his opinions were preceded by his statement, "I don't know," and he used the word "probably"; he also

---

[18] For example, Dr. Maddux stated that Plaintiff had MRIs done by other physicians, "and I think there was - - I think there was a question of a bulging lumbar disc and a bulging cervical disc" (the undersigned has found no evidence in the record of "bulging" discs).

often stated "I think" or "I presume" when estimating Plaintiff's abilities or describing her past medical history (Tr. 26; *see also* Tr. 354–65). While the equivocation of Dr. Maddox's testimony may not be a sufficient reason—standing alone—to discredit his opinions, it provides further support for the ALJ's decision to do so here, and the reason is substantially supported by the record. *See* Edwards, 937 F.2d at 584 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements or his ability to objectively assess the claimant's condition, or both).

The ALJ also noted that Dr. Maddux's opinions were not "echoed by Dr. Watts . . . in [his] examination and clinical studies" (Tr. 25). Although a less compelling reason—as Dr. Watts' treatment notes are limited, his treatment occurred early in the time frame relevant to Plaintiff's claim, and his treatment largely concerned the injury to Plaintiff's right wrist—the ALJ's reason is nevertheless generally supported by the record and supportive of a finding that Plaintiff is not disabled or as limited as Dr. Maddux has suggested. Initially, Dr. Watts is a specialist in the area of orthopaedic surgery, and in this instance, is also considered a treating physician. His notes reflect improvement of Plaintiff's wrist over the course of his treatment, and although Plaintiff reported some continued pain and numbness, she refused to undergo an injection that had previously provided relief, and she did not undergo electrodiagnostic studies as recommended by Dr. Watts. "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (citation omitted); *see also* Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) ("[T]he ALJ's consideration of Ellison's noncompliance as a factor in discrediting Ellison's allegations of disability is adequately supported . . . .").[19] Moreover, at Plaintiff's last visit with Dr. Watts, she reported having "a lot less pain" in the AC joint of her shoulder.

Lastly, the ALJ noted that objective tests conducted following Dr. Maddux's deposition, as with respect to those conducted before his deposition, do not substantiate disabling limitations (Tr. 27). These include, as detailed *supra*, a barium enema, abdominal CT scan, and pelvic CT scan, which revealed no or only minimal findings (e.g., polyps, diverticula).

---

[19] The court notes that Plaintiff similarly disregarded Dr. Stein's advice, as discussed more fully *supra*.

In contesting the ALJ's findings, Plaintiff contends that Dr. Stein's records are consistent with Dr. Maddux's because Dr. Stein indicated on August 31, 2004, that Plaintiff's complaints of pain were consistent with a cervical MRI that revealed foraminal narrowing (Doc. 18 at 5–6 (referencing Tr. 201)). Plaintiff's contention, however, is not persuasive. First, the ALJ did not specifically state that Dr. Stein's opinions directly conflicted with Dr. Maddux's; rather, the ALJ commented on the "record as a whole" as being inconsistent and then focused on the objective testing and opinions of Dr. Koulisis, Dr. Lucey and Dr. Watts (*see* Tr. 25–26). The ALJ understandably made little mention of Dr. Stein's records, given that Plaintiff saw him on only two occasions and failed to follow his treatment recommendations (*see* Tr. 24). Moreover, despite Plaintiff's complaints of pain, even Dr. Maddux acknowledged that Plaintiff maintained full range of motion in all areas, which would include range of motion in her neck/cervical area and which is consistent with Dr. Koulisis' and Dr. Lucey's examinations (*see* Tr. 298, 408, 410). Lastly, although Dr. Stein commented that Plaintiff experiences pain in the cervical area, he noted that her pain is intensified when she lies down, which is inconsistent with the testimony of Dr. Maddux that Plaintiff would need to lie down during the day. Thus, the one statement of Dr. Stein identified by Plaintiff does not change the undersigned's conclusion that the ALJ properly considered the record as a whole and did not err in finding that the evidence was generally inconsistent with the opinions of Dr. Maddux. Likewise, Plaintiff's contention that the evidence from Dr. Lucey is <u>not</u> inconsistent with Dr. Maddux's opinions—a contention based largely on the fact that Dr. Lucey reviewed Dr. Stein's August 31 treatment note and repeated his statements about Plaintiff's complaints of pain (*see* Doc. 18 at 6; Tr. 201, 297)—is unavailing. As fully detailed *supra*, other than a "somewhat diminished" range of motion in the lumbar spine, Dr. Lucey essentially found no physical limitations—including, relevant to the instant contention—no limitations in the neck/cervical area (*see* Tr. 298, 300). Indeed, Dr. Lucey went so far as to describe Plaintiff's "cervical disc disease with history of radiculopathy" as being in remission in May 2005 (Tr. 299).

Thus, in conclusion, because the ALJ articulated the inconsistencies on which he relied in discrediting Dr. Maddux's opinions, and because the ALJ's reasons are supported by substantial evidence on the record as a whole, the ALJ's finding should not be disturbed. Moreover, having properly discounted the opinions of Dr. Maddux, the ALJ did err in relying on other evidence in the

record in finding Plaintiff not disabled, including the opinions of Dr. Koulisis, Dr. Lucey, and the non-examining agency physicians, all of whom opined (or offered opinions consistent with a finding) that Plaintiff was capable of performing work at a light level of exertion (Tr. 33).[20]

Having so concluded, the ALJ determined that Plaintiff could return to certain past relevant work ("PRW") because that work is and was performed at the light exertional level and would not require physical exertion beyond Plaintiff's abilities. Moreover, the testimony of the VE is consistent with the ALJ's finding. Although her testimony was not required at step four, *see* Lucas v. Sullivan, 918 F.2d 1567, 1573 n.2 (11th Cir. 1990); *but see* SSR 82-61 (recognizing that a VE may be appropriate at step four), her testimony in this case provides additional evidence in support of the ALJ's conclusion. Thus, substantial evidence, including the VE's testimony, supports the ALJ's finding that Plaintiff can return to her PRW as an apartment complex manger, retail store manager, hair salon manager, and cashier, all of which (according the VE) are performed at the light exertional level.[21]

Two final contentions remain. Plaintiff alleges the ALJ erred in failing to fully develop the record because he did not recontact Dr. Maddux and erred in sending Plaintiff for a consultative examination instead of recontacting Dr. Maddux. Plaintiff states that the ALJ "expressly states that

---

[20] Light work is defined in 20 C.F.R. § 404.1567(b) as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

[21] The ALJ also found that Plaintiff could return to her PRW as an assembly-line worker (Tr. 36), but the VE identified this job as one performed at a medium level of exertion. The ALJ's error, however, is harmless because Plaintiff can perform the other PRW identified by the ALJ, all of which the VE characterized as "light." *See, e.g.*, Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (the ALJ's decision will stand when an incorrect application of the regulations results in "harmless error," because the correct application would not contradict the ALJ's ultimate findings); Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (the harmless error inquiry involves determining "whether the ALJ would have reached the same decision denying benefits, even if he had followed the proper procedure . . . .").

his reason for dismissing Dr. Maddux's opinions is an alleged conflict" and, therefore, the ALJ had a duty to re-contact him, and additionally or alternatively, a duty to recontact him prior to ordering a consultative examination, citing 20 C.F.R. §§ 404.1512(e), (f) (Doc. 18 at 16–17). However, Section 404.1512(e)(1) notes that a treating physician should be recontacted if the evidence received by the Commissioner from that source is "<u>inadequate</u> [to] determine whether [a claimant] is disabled." 20 C.F.R. § 404.1512(e) (emphasis added). Here, the evidence provided by Dr. Maddux was not inadequate to determine whether Plaintiff was disabled. Indeed, on the basis of the information he provided Plaintiff would have been found disabled (per the VE) if his opinions were fully credited; thus, enough information existed from Dr. Maddux to reach a decision as to whether Plaintiff was disabled. The fact that the ALJ chose to reject his opinions did not trigger a duty to recontact him. *See* <u>White v. Massanari</u>, 271 F.3d 1256, 1261 (10th Cir. 2001) ("It is the inadequacy of the record, rather than the rejection of the treating physician's opinion, that triggers the duty to recontact that physician."); *see also* <u>Clapp v. Astrue</u>, Case No. 3:06cv334/MCR/EMT, 2008 WL 275880, at *14 (N.D. Fla. March 4, 2008) (rejecting the same argument Plaintiff had made here regarding an ALJ's duty under §§ 404.1512(e), (f)). Moreover, the record did not otherwise warrant further development. The ALJ had all of Dr. Maddux's treatment records, as well as his deposition testimony, in addition to the records of other treating physicians, two consultative examiners, and two non-examining physicians. In light of the quantum of evidence before the ALJ, it is plainly evident to the undersigned that he had sufficient evidence to decide the case, no evidentiary gaps existed, and no unfairness or clear prejudice inured to Plaintiff. Accordingly, the ALJ did not err in failing to recontact Dr. Maddux.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 25th day of  February 2010.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).